FILED

2016 Feb-17  PM 12:46
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

|  |  |
|---|---|
| GARY LAW, ) | |
| ) | |
| Claimant, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. |
| ) | 4:14-cv-2238-KOB |
| CAROLYN W. COLVIN, ) | |
| COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | |
| ) | |
| Respondent. ) | |
| ) | |

## MEMORANDUM OPINION

## I. INTRODUCTION

On February 24, 2011, the claimant, Gary Law, applied for disability insured benefits under Title II of the Social Security Act. (R. 142–44). The claimant alleged that he became disabled on April 10, 2011 because of a torn ACL and MCL in his right knee, nerve damage to his index finger, high blood pressure, an irregular heart rhythm, high cholesterol, and depression. (R. 142, 146). The Commissioner denied the claimant's application. (R. 62–66). The claimant filed a timely request for a hearing before an Administrative Law Judge. (R. 69). The ALJ conducted two hearings, one on Janurary 2, 2013 and the other on March 10, 2013. (R. 25–60). On May 29, 2013, the ALJ issued a decision denying the claimant's application, finding that the claimant was not disabled as defined by the Social Security Act and was, therefore, ineligible for social security benefits. (R. 8–24). The Appeals Council denied the claimant's request for a review of the hearing decision on September 14, 2014. (R. 1–4). Consequently, the ALJ's decision became

1

the final decision of the Commissioner of the Social Security Administration. The claimant has exhausted his administrative remedies, and this court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, the court AFFIRMS the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant presents the following issues for review[1]:

1.   whether the ALJ erred by failing to send the claimant for a consulting evaluation by a licensed orthopedist;

2.   whether substantial evidence supports the ALJ's decision that the claimant was capable of performing sedentary work;

3.   whether the ALJ failed to consider the claimant's impairments in combination when determining whether the claimant was disabled.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited.  This court must affirm the Commissioner's decision if the ALJ applied the correct legal standards and if his substantial evidence supports his factual conclusions. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999.  This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence.

---

[1] Initially, the claimant advanced a fourth argument that the ALJ's decision that the claimant was not credible was not supported by substantial evidence given that the ALJ did not consider evidence submitted to the Appeals Council.  In his reply brief, the claimant withdrew this argument.

"Substantial evidence" is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 402 (1971).

The court must keep in mind that opinions, such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors, "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability."  20 C.F.R. §§ 404.1527(d), 416.927(d). Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner."  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings."  *Walker*, 826 F.2d at 999.  A reviewing court must not only look to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986). A decision is not based on substantial evidence that focuses on one aspect of the evidence while disregarding other contrary evidence. *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the

3

person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). To make this determination the Commissioner employs a five-step, sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986)[2]; 20 C.F.R. §§ 404.1520, 416.920.

The ALJ has an obligation to develop the factual record, but he is not required to order a consultative examination if the record contains sufficient evidence to support an informed decision. *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1269 (11th Cir. 2007). The claimant bears the burden of proving that he is disabled and accordingly has the responsibility to produce evidence to support his claim. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003). For remand to be appropriate, a claimant must show "unfairness" or "clear prejudice" resulting from the ALJ's failure to develop the factual record. *Brown v. Shalala*, 44 F.3d 931, 935 (11th Cir. 1995).

---

[2]*McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) was a supplemental security income case (SSI).  The same sequence applies to disability insurance benefits.  Cases arising under Title II are appropriately cited as authority in Title XVI cases.  *See, e.g.*, *Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

An ALJ may rely on the testimony of a vocational expert to establish that the claimant has the ability to adjust to other work in the national economy. *Richter v. Comm'r of Soc. Sec.*, 379 F. App'x 959, 960 (11th Cir. 2010). When relying on such testimony, the ALJ must pose hypothetical questions to the vocational expert that encompass all of the claimant's impairments. If the ALJ presents the vocational expert with an inadequate hypothetical, the vocational expert's testimony will not constitute substantial evidence. *Jacobs v. Comm'r of Soc. Sec.*, 520 F. App'x 948, 950 (11th Cir. 2013). While not every symptom need be found in the ALJ's hypothetical, all of the claimant's impairments must be included for the vocational expert's testimony to constitute substantial evidence. *Richter,* 379 F. App'x at 960. Hypotheticals that "implicitly account" for the claimant's limitations are sufficient. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1181 (11th Cir. 2011).

When a claimant alleges multiple impairments, the ALJ has a duty to consider the impairments in combination and determine whether the combined effect of the impairments renders the claimant disabled. *Jones v. Dep't of Health & Human Servs.*, 941 F.2d 1529, 1533 (11th Cir. 1991). When the ALJ states that he considered the impairments in combination, the ALJ discharges his duty. *Hamby v. Soc. Sec. Admin., Com'r*, 480 F. App'x 548, 550 (11th Cir. 2012) ("This requirement is met if the ALJ states that the claimant 'did not have an impairment or combination of impairments' that would amount to a disability."); *See also Wheeler v. Heckler*, 784 F.2d 1073, 1076 (11th Cir. 1986) (finding that the ALJ's statement that "that appellant is not suffering from any impairment, or *a combination of impairments*. . ." was sufficient to satisfy the duty to consider the claimant's impairments in combination) (emphasis in original); *Hutchinson v. Astrue*, 408 Fed. Appx. 324, 327 (11th Cir. 2011) (holding that the

5

ALJ's opinion stating that the claimant lacked an "impairment, individually or in combination" that met a listing impairment was sufficient).

## V. FACTS

The claimant is a forty-eight-year-old man with a tenth grade education. (R. 53). The claimant has fifteen years of past relevant work experience as a self-employed carpenter but has not engaged in substantial gainful activity since the middle of August 2010. (R. 47–49, 147). The claimant alleges disability based on a torn ACL and MCL in his right knee, nerve damage to his index finger, high blood pressure, an irregular heart rhythm, high cholesterol, and depression. (R. 146).

*Physical and Mental Impairments*

On March 24, 2010, the claimant went to the Marshall Medical Center to have his right knee assessed. The MRI revealed a complete tear of the ACL, but found that the MCL, PCL, and LCL were still intact. Additionally, the scan showed evidence of tears of the posterior horns of the medial and lateral menisci; a large amount of edema of the proximal tibia and fibula head but with no large fracture line present; a small amount of edema of the medial femoral and lateral femorale condyle; and a large suprapateller joint effusion. (R. 233).

On May 4, 2010, the claimant visited Dr. Stanton Davis at The Orthopedic Center in Huntsville, Alabama to seek treatment for his right knee pain. The claimant described his pain as 10/10 in severity and complained of swelling. The claimant said that nothing improved the pain and that walking aggravated it. Dr. Davis confirmed the diagnosis of a tear of the ligaments in the right knee that required surgery to repair. (R. 274–75).

While cutting a metal plate at work, the claimant injured himself when his side grinder recoiled and cut his left index finger. On August 11, 2010, the claimant had surgery to repair a

6

torn extensor tendon in his finger. Dr. Matthew Smith successfully performed the procedure at Marshall Medical Center, but noted that the claimant's radial digital nerve likely had been destroyed by the accident. When Dr. Smith explored the finger during surgery, none of the nerve was visible, and the area where the nerve should have been located was macerated. (R. 217–19).

Following the surgery, Dr. Smith referred the claimant to Dr. John Walker so that he could get orders for therapy and a finger splint. Dr. Walker saw the claimant on August 26, 2010. Dr. Walker noted that the radial half of the claimant's left index finger was numb, but that the surgical wound was clean and healing well. The claimant said his pain was intermittent and sharp, and 5/10 currently but 8/10 at its worst. Dr. Walker recommended occupational therapy and another follow-up visit with Dr. Smith. (R. 216, 219).[3]

The claimant appears to have had six occupational therapy sessions at SportsMed.[4] In a progress report dated December 28, 2010, the occupational therapist reported that the claimant experienced pain he described as being a 5/10. The handwriting in the report is difficult to read, but the report clearly shows that the claimant had only met two of his six treatment goals at the time of his discharge on December 30, 2010. (R. 219–21).

The claimant visited the Med-Assist Doctors Group in Albertville twice. On November 1, 2010, the claimant went to Med-Assist to seek refills for his hypertension medications and treatment for his depression. The claimant reported to Dr. Jess Youngblood that he was depressed because of losing a child in a custody dispute. Dr. Youngblood described the claimant

---

[3] The claimant does not appear to have seen Dr. Smith again.

[4] The record does not contain reports on the claimant's individual occupational therapy sessions. The only documents related to the claimant's time in therapy in the record are the initial plan of care, and an interval progress report. *See* (R. at 219–21).

as "tearful" and "depressed," but said he did not have suicidal thoughts or tendencies. Dr. Youngblood noted that the claimant reported his pain to be severe without medication, though well controlled with it, and that he was "doing well" on his current medication for anxiety. The claimant was taking Lortab, Klonopin, Zocor, Zestil, and Prilosec. Dr. Johnston also prescribed Celexa to treat the claimant's depression. (R. 223).

On January 31, 2011, Dr. Larry Johnston of Med-Assist examined the claimant. At a follow-up visit for the claimant's chronic back and right knee pain. Dr. Johnston reported that the claimant said he was doing very well with his current medication. The claimant reported his pain to be 6/10 without medication and 2/10 with it. Dr. Johnston also inquired about the claimant's psychological health. The claimant reported that his anxiety was controlled by his medication and denied having homicidal or suicidal thoughts. Dr. Johnston described the claimant's demeanor as "calm" and his nerves as "stable," and indicated the claimant was better able to rest and cope with the stresses of daily life than before he was on medication. (R. 226).

The claimant received no medical treatment for the next eight months. On September 8, 2011, Dr. Samuel D. Williams performed a Psychiatric Review Technique on the claimant at the request of the Social Security Administration. Dr. Williams stated that the claimant suffered from depressive disorder and general anxiety disorder. While these conditions are medically determinable impairments, Dr. Williams found the conditions not to be severe. (R. 279–92).

In 2011 and 2012, the claimant again saw Dr. Jess Youngblood, now a family physician at Premier Family Care, several times for general office visits.[5] On August 16, 2011, the claimant saw Dr.Youngblood for a routine checkup. The claimant's blood pressure and hypertension were controlled and at goal levels. Dr. Youngblood reported that the claimant had

---

[5] The claimant had also seen Dr. Youngblood once previously at Med-Assist.

aggravated his knee pain by falling while attempting to climb through a window. Dr. Youngblood was concerned that depression may be contributing to the patient's chronic pain, but the claimant denied he was suffering from depression. At the time, the claimant was taking Atenolol, Celexa, Prilosec, Zestril, Zoncor, Klonopin, and Ambein. (R. 322–25).

On October 17, 2011, the claimant went to see Dr. Youngblood for a follow-up visit to check on his knee pain. Dr. Youngblood noted that the claimant had an orthopedic examination scheduled for that same day, but no documentation from such an examination is found in the record. Dr. Youngblood also recorded that the claimant's LDL cholesterol and hypertension were not at goal levels. To remedy these issues, Dr. Youngblood prescribed Niacin. Additionally, Dr. Youngblood observed no visible anxiety or depression in the claimant. (R. 315–21).

On November 28, 2011, the claimant went to the emergency room at Marshall Medical center complaining of severe headaches and difficulty breathing. His blood pressure was 156/88. The nursing record reflects that the claimant also complained of anxiety, depression, and sadness, but the nurse did not note any psychiatric symptoms exhibited by the claimant's behavior. The claimant's affect was appropriate, his speech was normal, and he was cooperative and maintained eye contact. The claimant posed no risk of suicide. After an x-ray and EKG revealed no acute chest abnormality, the claimant was then discharged. (R. 293–308).

On December 16, 2011, the claimant saw Dr. Youngblood to again follow-up on his cholesterol levels and knee pain. Dr. Youngblood recorded that the claimant's LDL cholesterol was not at goal level, despite the fact that he was taking Zocor. Dr. Youngblood stated that the claimant was not able to tolerate the Niacin he had previously prescribed. Dr. Youngblood then prescribed Lipofen for the claimant's cholesterol condition. Dr. Youngblood also observed no

anxiety in the claimant. (R. at 310–11).

During that same visit, the claimant reported that his knee pain was not controlled with his current medication and asked Dr. Youngblood to increase his dosage. Dr. Youngblood maintained the claimant's Lortab at its current level, stating that he would not increase his dosage until the claimant had paid for the results of his urine drug screening test. If the amount was not paid by the end of the day, Dr. Youngblood said the screening would be considered a failed test.  Although the record is unclear regarding whether the claimant paid, the record from this visit indicates that "drug inquiry passed." (R. at 312).

On April 16, 2012, the claimant saw Dr. Youngblood for a follow-up visit. The claimant stated that his pain was severe without medication but well controlled with it. Dr. Youngblood observed no anxiety or delusions. (R. 371–80).

On September 13, 2012, the claimant returned to Dr. Youngblood for another follow-up visit. The claimant complained about his chronic right knee pain. Dr. Youngblood noted that his hypertension and blood pressure were under control with the current medication and that the claimant was not experiencing side-effects from the drugs. Dr. Youngblood observed that the claimant did not appear to be suffering from anxiety or depression. (R. 376–79).

On October 10, 2012, the claimant saw Dr. Youngblood again for a follow-up visit. Dr. Youngblood noted that the claimant's hypertension was controlled and his blood pressure was at its goal levels. Dr. Youngblood saw no symptoms of anxiety or depression. The claimant's right knee was tender, but the knee was not swollen or unstable. (R. 372–75).

At the request of the Social Security Administration, Dr. Henry M. Born, a general practitioner, performed a consultative examination of the claimant on February 19, 2013. Dr. Born diagnosed the claimant with a torn meniscus, medial and lateral, in the right knee; possible

10

torn ligaments in the left knee; chronic pain in both knees; depression; anxiety; hypertension; and hypercholesterolemia. (R. 385–87).

Dr. Born conducted an orthopedic examination of the claimant, finding "limited pain" when the claimant fully flexed the right knee; tenderness on the right knee, but not the left, at the joint line; no lateral instability; and a normal range of motion at the feet, ankles, and hips. Dr. Born observed that the claimant's x-rays revealed that joint space in the right knee was well maintained and that the bones were "normally mineralized" with no soft tissue calcifications. Dr. Born did observe "some sclerotic degenerative changes" in the right knee. When Dr. Born examined the claimant's left knee, he found that the joint space was well maintained. The bones were "normally mineralized" with no soft tissue calcifications. The bones had no soft tissue calcifications and no evidence of sclerotic degenerative changes. (R. 387).

Dr. Born also completed a Medical Source Statement detailing the claimant's ability to perform work-related activities. Dr. Born found that the claimant could lift and carry up to twenty pounds frequently and twenty-one to fifty pounds occasionally, but should never lift or carry more than one hundred pounds. Dr. Born also found that the claimant could sit for five hours, stand for one hour, and walk for a half-hour without interruption. Dr. Born stated that the claimant could sit for six hours, stand for two hours, and walk for one hour total in a single day. (R. 390–91).

Dr. Born reported that the claimant could frequently engage in reaching, handling, fingering, feeling, and push/pull activities with both his left and right hands. Dr. Born restricted the claimant to only occasionally operating foot controls with either of his feet; occasionally balancing or stopping; and never climbing stairs, ramps, ladders, or scaffolds, kneeling, crouching, or crawling. (R. 392–93).

11

Regarding the claimant's environmental limitations, Dr. Born found that the claimant could occasionally be exposed to unprotected heights, moving mechanical parts, pulmonary irritants, and vibrations; frequently operate a motor vehicle; frequently be exposed to humidity, wetness, and extreme cold or heat; and could tolerate moderate office noise. Dr. Born stated that the claimant could shop, walk at a reasonable pace, use public transportation, travel without a companion, ambulate, prepare a simple meal, care for his personal hygiene, and sort papers or files. (R. 394–95).

*The ALJ Hearing*

A.    *First Hearing*

On January 2, 2013, the ALJ held a hearing where the claimant was the sole witness. The ALJ examined the claimant first. The claimant testified that for the last fifteen years he was self-employed as a carpenter building houses and that he currently lived in Arab, Alabama with his wife. The claimant said he had a tenth grade education and had not received any sort of formal vocational training. (R. 49–54).

The claimant testified that he had not worked since 2010. The claimant said he was leaving work on April 10, 2010, when he stepped in a hole and fell over a lumber pile, injuring his right knee. The claimant said that the pain in his knee resulting from that injury still prevents him squatting completely or bending his leg back. Additionally, the claimant said that he was also prevented from working because of an injury to his left index finger, and his irregular heart beat, high blood pressure, and panic attacks. (R. 55–56).

The claimant's attorney then examined him. The claimant testified that he suffered from migraine headaches three to four times a week and was currently taking Imitrex to combat them. Regarding his knee pain, the claimant said that sitting in a hard chair aggravated his condition

12

and that he typically propped his leg up on a pillow when he was at home. The claimant said he could not stand still and used a cane nearly all the time. The claimant testified that he was aware that his knee required surgery, but that he had been unable to find a doctor to perform the procedure because he did not have insurance. (R. 56–58).

After the claimant's attorney had finished her examination, the ALJ said that the claimant needed to have an "orthopedic examination." The ALJ informed the claimant that he would receive a notice in the mail with instructions on which physician to go see. Eventually, the ALJ sent the claimant to see Dr. Born. (R. 59).

B.    *Second Hearing*

On April 10, 2013, the ALJ held a second hearing where the claimant and Norma Jacobson, the vocational expert, testified. The ALJ examined the claimant first. The claimant stated that his condition had not changed since the last hearing. The claimant clarified that he had attempted to return to work after his accident in August 2010, but that he was unable to work. (R. 30–32).

Next the claimant's counsel examined him. The claimant testified that Dr. Davis was the physician who advised that his right knee required surgery, and that he desired to have the surgery because his pain left him unable to lift an excessive amount of weight, jump, or squat. The claimant said he could walk half a block at a flat incline without stopping, but after that distance, he would experience pain around his right kneecap, swelling in his right calf muscle, and muscle spasms in his right leg. The claimant said doctors told him that the recuperation time for the procedure on his knee would be seven to nine months. The claimant also testified his left knee needed surgery as well because of a torn MCL, but, as with his right knee, he was unable to have the surgery because he did not have the money or insurance. (R. 33–34).

13

Regarding the injury to his left index finger, the claimant explained that he had cut the ligaments as well as the bone itself in the finger. This injury, the claimant said, made it difficult to grasp items with his left hand. The claimant said he experienced difficulty picking up and carrying objects.  The claimant also testified that he had difficulty picking up heavy objects with his right hand as it placed pressure on his injured right knee. The claimant said he was not capable of sitting at a table or bench and working with both of his hands. (R. 34–35).

The claimant said he could only sit for ten to fifteen minutes at a time and that his right foot needed to be propped up to take the pressure off his knee. To become comfortable again sitting, the claimant testified he needed to walk for five to ten minutes before resuming sitting. (R. 36–37).

The vocational expert Norma Jacobson testified next. The ALJ asked Ms. Jacobson whether a person with the following limitations could perform jobs that existed in the national economy: sedentary work; precluded from continuous reaching, handling, fingering, feeling, pushing and pulling with either hand; only occasional fingering with the left hand; only occasional use of foot or leg controls; precluded from climbing, kneeling, crouching, or crawling; limited to working on a flat, even surface; only occasional exposure to unprotected heights, moving mechanical parts, pulmonary irritants and vibrations. The ALJ acknowledged that the claimant would be unable to perform his past work as a carpenter. (R. 38–39).

Ms. Jacobson responded that the claimant could perform at least three positions: cashier, order clerk, and information clerk. Ms. Jacobson stated that a cashier was a sedentary position with 2,000 positions in the state economy and 90,000 in the national economy; an order clerk was a sedentary position with 1,000 positions in the state economy and 27,000 in the national economy; an information clerk was a sedentary position with 1,700 positions in the state

economy and 100,000 in the national economy. Ms. Jacobson testified that the acceptable rate of absenteeism for these positions was one-and-a-half day a month. (R. 39).

*The ALJ's Decision*

On May 29, 2013, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. The ALJ found that the claimant met the insured status requirement of the Social Security Act and had not engaged in substantial gainful activity since the alleged onset of his disability. The ALJ also found that the claimant suffered from two severe impairments: migraine headaches and a torn ACL and MCL in his right knee with no treatment (R. 13).

The ALJ found that the claimant's hypertension, irregular heartbeat, high cholesterol, depression, and anxiety were not severe impairments. The ALJ noted that on November 1, 2010, the claimant's blood pressure was stable and his cholesterol and anxiety controlled with medication. Relying on Dr. Youngblood's treatment records from June 2010, the ALJ observed that the claimant's condition were still controlled in 2011. While acknowledging"fluctuations" with the claimant's blood pressure and anxiety, the ALJ observed that the claimant had not demonstrated a connection between these conditions and any limitation or restriction on his ability to work. Further, the ALJ gave considerable weight to the psychiatric review performed by Dr. Williams, which found that the claimant's depression and anxiety were not severe. The ALJ noted that Dr. Williams observed that the claimant received ongoing care for his depression and anxiety from his treating physician, who said that his medications were controlling his conditions. (R. 13–14, 18).

Next the ALJ determined that the claimant's severe impairments—even when considered in combination—did not equal the severity of the listed impairments in 20 C.F.R. § 404.1520(d)

and § 404.1526. The ALJ observed that no treating, examining, or reviewing physician had suggested that any impairment, or combination of impairments, met the criteria of any listed impairment. Relying on the opinion of Dr. Williams as well the medical records, the ALJ found that the claimant had only "mild restriction in activities of daily living" and "mild difficulties" with social functions, concentration, persistence, and pace.  (R. 13–14).

The ALJ found that the claimant had the residual functional capacity to perform sedentary work with the following additional limitations: no continuous reaching, handling, fingering, feeling, pushing or pulling with the hands bilaterally; no more than occasional use of foot and leg controls; no climbing, kneeling, crouching, or crawling; work limited to flat, even surfaces; no more than occasional exposure to unprotected heights, moving mechanical parts, pulmonary irritants, and vibrations. (R. 14).

To reach this conclusion, the ALJ considered the claimant's testimony concerning the claimant's pain and its limitations on his ability to perform work. The ALJ determined that while the claimant's medically determinable impairments could be reasonably expected to cause the alleged symptoms, the claimant's statements concerning the intensity and persistence of the pain and the limitations it caused were not credible. (R. 17).

The ALJ relied on and assigned great weight to Dr. Born's opinion. The ALJ found that despite the torn ACL and MCL in the claimant's right knee, he was still capable of performing sedentary work subject to additional limitations based on the restrictions provided by Dr. Born. The ALJ noted that sedentary work would allow the claimant to avoid putting pressure on his right knee, reducing his pain. The ALJ also stated that he considered the injury to the claimant's finger by placing additional limitations on the type of work the claimant could perform involving his hand. (R. 17).

16

The ALJ stated that the residual functional capacity he assigned to the claimant was consistent with the claimant's reported migraines. The ALJ noted that the claimant stated that if he sat still and took his medication, the migraine could potentially be avoided. Based on this testimony, the ALJ found no reason the claimant's migraines precluded him from all work. Further, the ALJ noted that he had taken into account appropriate restrictions considering the claimant's migraines, including limiting the claimant to only occasional exposure to unprotected heights, moving mechanical parts, pulmonary irritants, and vibrations. (R. 17).

The ALJ found that the claimant was unable to perform his past relevant work as a carpenter as the exertion level required for that job was beyond the residual functional capacity of the claimant. The ALJ then examined whether the claimant was capable of performing other work. (R. 18).

After considering the claimant's age, education, work experience, and residual functional capacity, the ALJ found that jobs existed in significant numbers in the national economy that the claimant was capable of performing. Because the claimant was not capable of performing the full range of sedentary work, the ALJ relied on the opinion of the vocational expert, Ms. Jacobson. Noting that Ms. Jacobson had identified three positions–cashier, order clerk, and information clerk–that existed in significant numbers in the national economy that the claimant could perform, the ALJ determined that the claimant was capable of successfully adjusting to other work. Accordingly, the ALJ found the claimant not to be disabled for purposes of the Social Security Act. (R. 19).

## VI. DISCUSSION

### Issue One: The Consulting Examination

On appeal, the claimant argues that the ALJ erred by failing to send the claimant to an

17

orthopedic specialist for a consulting evaluation. However, the ALJ was not required to send the claimant to  an orthopedic specialist exists in this case because the opinion provided by Dr. Born enabled the ALJ to make an informed decision. Accordingly, the ALJ satisfied his duty to develop the record. Further, the claimant has failed to show what—if any—prejudice resulted from the ALJ decision to send the claimant to a general physician rather than an orthopedic specialist.

The ALJ has no obligation to order a consultative examination if the record contains sufficient evidence to support an informed decision. *Ingram*., 496 F.3d at 1269. For the court to remand the case for failure to order a consultative examination, the claimant bears the burden of establishing "clear prejudice" from the ALJ's failure to seek a consulting opinion. *Brown*, 44 F.3d at 935.

The claimant conclusorily asserts that Dr. Born's report supports a finding that the claimant is disabled. The claimant offered no further explanation or analysis of how that may be the case. Later in his brief, the claimant also argues that Dr. Born's report is unclear as to whether the claimant's impairments were disabling. Both of these contradictory arguments lack merit for two reasons.

First, the question of whether the claimant is disabled is not a question for a consulting physician. The physician's role is to describe the claimant's impairments. Whether a claimant is disabled is a matter of law, not a medical opinion. Dr. Born evaluated the claimant and offered an opinion as to his impairments. The fact that Dr. Born's opinion did not address the question of disability is not a failure, nor does it render his opinion unclear. Dr. Born's role, which he fulfilled, was to describe the claimant's physical impairments.

18

Second, the ALJ was able to make an informed judgment on the claimant's alleged disability based in part on Dr. Born's opinion. While he was a general practitioner and not an orthopedic specialist, Dr. Born performed a detailed orthopedic examination of the claimant, examining his range of motion, the structural integrity of his knees, and his pain. Dr. Born was qualified to administer this exam. Using this information, the ALJ was able to come to an informed decision regarding the claimant's residual functional capacity given his impairments, as the ALJ had an expert  medical opinion about the claimant's impairments.

The ALJ properly utilized Dr. Born's opinion. In reaching his decision that the claimant was capable of performing light work subject to additional limitations, the ALJ considered each of the limitations and restrictions Dr. Born found. The ALJ described the claimant's condition in a hypothetical to a vocational expert who testified that the claimant was capable of performing jobs that existed in significant numbers in the national economy. Therefore, the ALJ properly used Dr. Born's opinion to form his opinion that the claimant is not disabled.

Finally, the claimant has failed to show—or even allege—any prejudice as a result of the ALJ sending him to Dr. Born rather than an orthopedic specialist. The claimant makes much of the fact that during the first hearing the ALJ said he would send the claimant to an orthopedist. However, the ALJ did not say that. Rather, the ALJ said he would send the claimant "for an orthopedic examination." (R. 58–59). An orthopedic examination does not require a licensed orthopedist, and it does not appear that such a qualification would have made a difference in the claimant's case. Dr. Born diagnosed the claimant with precisely the conditions in his knee that he claimed caused him to be disabled. No indication exists that an orthopedic specialist would provide any additional useful knowledge that would be a prerequisite for the ALJ making an

informed decision on the claimant's alleged disability. Therefore, the ALJ had no obligation to seek a consulting opinion from an orthopedic specialist to fully develop the factual record.

*Issue Two: The ALJ's RFC Assessment*

The second argument the claimant advances is that the ALJ failed to provide the vocational expert with a hypothetical that accurately reflected the claimant's impairments. Specifically, the claimant argues that the hypothetical presented to the vocational expert failed to accurately reflect the claimant's left knee impairment. However, the ALJ's hypothetical considered each and every one of the claimant's impairments. Therefore, the testimony of the vocational expert constitutes substantial evidence.

To constitute substantial evidence, the testimony of a vocational expert regarding a hypothetical must consider all of the claimant's impairments. *Richter*, 379 F. App'x at 960. Such hypotheticals may do so implicitly, as not every symptom need be stated. *Winschel.*, 631 F.3d at 1181.

Because the vocational expert is not a medical expert, the ALJ is not supposed to provide the vocational expert with medical diagnoses but instead the physical limitations resulting from those conditions. The ALJ did precisely that. The ALJ clearly considered the claimant's left knee impairment when formulating his hypothetical for the vocational expert at the hearing. (R. 38–40). The hypothetical presented by the ALJ at the hearing was precisely the limitations detailed by Dr. Born in his Medical Source Statement. Dr. Born diagnosed the claimant with possible torn ligaments in his left knee, and the limitations he assigned to the claimant were given with that diagnosis in mind. (R. 387, 391–95). Therefore, the ALJ's hypothetical considered the impairments associated with the claimant's left knee problem, and the testimony of the vocational expert constituted substantial evidence regarding the claimant's ability to find

20

work that he was capable of performing.

*Issue Three: Considering the Combination of the Claimant's Impairments*

Finally, the claimant relies on *Williams v. Barnhart* to argue that the ALJ erred by failing to refer to all of the alleged impairments while developing findings regarding the effect of the combination of the claimant's impairments. 186 F. Supp. 2d 1192 (M.D. Ala. 2002). However, *Williams* can be distinguished. Further, the claimant argues that the case law regarding precisely how much analysis the ALJ is required to engage in when considering the impairments in combination is unclear. But the Eleventh Circuit has spoken to this issue, and the ALJ satisfactorily considered the claimant's impairments in combination with each other.

The ALJ must consider the effects of the combination of the claimant's impairments in determining whether he is disabled. *Jones*, 941 F.2d at 1533. The Eleventh Circuit has provided guidance on what satisfies the ALJ's duty to consider the claimant's impairments in combination. By addressing all of the claimant's alleged impairments and stating that they have been considered in combination, the ALJ discharges his duty. *Hamby*, 480 F. App'x at 550; *Wheeler*, 784 F.2d at 1076; *Hutchinson*, 408 Fed. Appx. at 327. The ALJ utilized precisely the language that the Eleventh Circuit has previously affirmed as sufficient. The ALJ explicitly stated that he found that the claimant did not have an "impairment or *combination of impairments*" that rendered the claimant disabled. (R. 14) (emphasis added). Such language is sufficient to satisfy the ALJ's obligation.

The court's reasoning in *Williams* is not to the contrary, as it involves a set of facts materially distinct from this case. In *Williams*, the ALJ erred by "simply fail[ing] to address some of the claimant's alleged impairments," and the opinion did not "reveal the extent to which the ALJ evaluated those symptoms or impairments beyond step two of the sequential evaluation

process." 186 F. Supp. 2d at 1197–98. Here, the claimant does not contend that the ALJ failed to address all of the claimant's alleged impairments. Rather, the claimant's sparse argumentation appears to contend that the ALJ's statement that he considered the combination of the claimant's impairments was conclusory and did not reflect the actual analysis in which the ALJ engaged.

Unlike the ALJ's opinion in *Williams*, clear evidence exists that the ALJ considered the claimant's impairments in combination beyond the second step of the evaluation process. When considering whether the claimant had an impairment that medically equals the severity of a listed impairment in step three, the ALJ noted that "no treating, examining, or reviewing physician has suggested the existence of any impairment *or combination of impairments* that would meet or medically equal the criteria of any listed impairment." (R. 14) (emphasis added). The ALJ engaged in a more substantial analysis than the ALJ in *Williams* conducted.

To the extent that *Williams* might require more of the ALJ than is found in his opinion here, such a requirement would be inconsistent with this Circuit's case law and is, therefore, unpersuasive.  Accordingly, the court finds that the the ALJ satisfied his duty to consider the effects of the combination of the claimant's impairments in determining whether he was disabled.

## VII. CONCLUSION

For the reasons stated above, this court concludes that the ALJ applied the proper legal standards and that substantial evidence supports the Commissioner's decision. Accordingly, this court AFFIRMS the decision of the Commissioner. The court will enter a separate Order to that effect simultaneously.

DONE and ORDERED this 17th day of February, 2016.


KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE